1 | **CARMEN A. TRUTANICH**, City Attorney (State Bar #86629x)
**MICHAEL L. CLAESSENS**, Senior Assistant City Attorney
2 | **CORY M. BRENTE**, Assistant City Attorney
**SUREKHA A. PESSIS**, Deputy City Attorney (State Bar #193206)
3 | 600 City Hall East
200 North Main Street
4 | Los Angeles, California  90012-4129
Telephone:  (213) 978-7036  Facsimile: (213) 978-8785
5 | Email: _Surekha.Pessis@lacity.org_

6 | Attorneys for Defendants, **CITY OF LOS ANGELES, LOS ANGELES POLICE
DEPARTMENT, WILLIAM BRATTON, STEVE MOODY, and ROBERT PULIDO**
7 |

8 |

9 | **UNITED STATES DISTRICT COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 |

12 | MICHAEL WALKER                )   CASE NO. CV 08-04707 PJ
                              )
13 |                               )   **MOTION IN LIMINE NO. ONE**
               Plaintiff,      )
14 |                               )   **NOTICE OF MOTION AND MOTION
        vs.                    )   IN LIMINE NO. 1 TO LIMIT THE
15 |                               )   TESTIMONY OF PLAINTIFF'S
                              )   EXPERT AND THE
16 |                               )   PROSECUTORS/DEFENSE
CITY OF LOS ANGELES, et al.   )   ATTORNEYS; MEMORANDUM OF
17 |                               )   POINTS AND AUTHORITIES;
                              )   DECLARATION OF SUREKHA A.
18 |           Defendants.       )   PESSIS**
                              )
19 | ————————————————  )
                                  Trial Date:      February 2, 2010
20 |                               Courtroom:       827-A
                                  Mag. Judge:      Hon. Patrick J. Walsh
21 |

22 |

23 | ***TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:***

24 |      PLEASE TAKE NOTICE on February 2, 2010, at 8:30 a.m. in Courtroom 827-A

of the United States District Court located at 312 North Spring Street, Los Angeles,
25 |
California; Defendants **City of Los Angeles, Los Angeles Police Department, Steve**
26 |
**Moody and Robert Pulido**, ("Defendants") will move this Honorable Court for an order
27 |

28 |

1   in limine to exclude evidence and references to whether evidence of subsequent, similar

2   crimes is "exculpatory" in nature by plaintiff and his witnesses, including, but not

3   limited to plaintiff's expert Roger Clark and the prosecutors who filed charges against

4   Plaintiff and were otherwise involved in the prosecution of Plaintiff, and in addition, the

5   plaintiff's defense attorneys.

6         Further, Defendants seek an order precluding plaintiff's expert Roger Clark from

7   testifying that Detective Moody should have been aware of other robbery investigations.

8         This Motion will be based on this Notice, the attached Memorandum of Points and

9   Authorities, Declaration of Surekha A. Pessis and attached exhibits, all records and

10   pleadings on file in this action, and such other and further argument or evidence that may

11   be permitted at the hearing.

12         Compliance with Local Rule 7-3 occurred on May 22, 2009 and

13   December 15, 2009.  (See Declaration of Surekha A. Pessis Re: Compliance with Local

14   Rule 7-3.)

16   Dated:  January 28, 2010        Respectfully submitted,

                     **CARMEN A. TRUTANICH**, City Attorney
                     **MICHAEL L. CLAESSENS**, Senior Assistant
                     City Attorney
                     **CORY M. BRENTE**, Assistant City Attorney

                     By
                       **SUREKHA A. PESSIS**, Deputy City Attorney
                     *Attorneys for Defendants*, **CITY OF LOS ANGELES,**
                     **LOS ANGELES POLICE DEPARTMENT,**
                     **WILLIAM BRATTON, STEVE MOODY, and**
                     **ROBERT PULIDO**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

This action arises from the arrest of Plaintiff, Michael Walker, on August 13, 2005 for violating *Penal Code* Section 211(a). On that date, Mr. Walker was arrested for the robbery of the EB Games establishment, which occurred three (3) days earlier on August 13, 2005. Thereafter, Detective Moody concluded Plaintiff may have been the suspect in several other demand note style robberies which occurred in LAPD's Southwest Division during the Summer of 2005. Mr. Walker was in custody for a period of twenty-seven months (27) prior to charges being dismissed by the prosecution.

Plaintiff filed his Section 1983 action during the Fall of 2008, wherein he alleges his civil rights were violated by Detective Moody and Detective Pulido because they failed to turn over "Brady" material to prosecutors.

At his deposition on September 29, 2009, Plaintiff's police expert, retired Lieutenant Roger Clark (Los Angeles County Sheriff's Department), testified without authority, that the officers possessed Brady (i.e. The reports relating to the Burger King and Golden Bird restaurants) material and failed to turn it over to the prosecution. Further, Plaintiff's expert testified that Detective Moody should have been aware of other robbery investigations conducted by the LAPD during the summer of 2005. Finally, Plaintiff is expected to attempt to elicit testimony from the prosecutors that certain information was "Brady" material. It is likely plaintiff will also attempt to elicit such testimony from his defense attorneys. For the reasons stated herein, the Motion in Limine should be granted.

///
///
///

1

## II.

## THE DETERMINATION OF WHETHER EVIDENCE IS BRADY MATERIAL IS NOT THE PROPER SUBJECT MATTER FOR THE PLAINTIFF'S WITNESSES

The government violates its constitutional duty to disclose material exculpatory evidence where (1) the evidence in question is favorable to the accused in that it is exculpatory or impeachment evidence, (2) the government willfully or inadvertently suppresses this evidence, and (3) prejudice ensues from the suppression (i.e., the evidence is material). Evidence is material for <u>Brady</u> purposes if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. <u>Silva v. Brown</u>, 416 F.3d 980, 985 (9th Cir. 2005)(internal citations and quotations omitted).

In the Motion for Summary Judgment, Defendants argued there was no clearly established law in 2005 that required detectives to disclose similar-crimes evidence. In fact, there is law that states the contrary. <u>See</u> <u>McGonagle v. United States</u>, 2002 DNH 185 (D.N.H. 2002)(concluding no <u>Brady</u> violation for failure to provide nationwide similar modus operandi printout information of major robbery suspects or crews to suggest other criminals committed crimes). Further, Defendants argued it is not unusual to deny discovery requests based on similar-crimes evidence. <u>See</u> <u>People of Territory of Guam v. Ignacio</u>, 10 F.3d 608, 615 (9th Cir. 1993) (citing <u>Perry v. Rushen</u>, 713 F.2d 1447, 1449 (9th Cir. 1983)); See also <u>United States v. Merkosky</u>, 2007 U.S. Dist. LEXIS 66605 (ND OH 2007)(affirming denial of discovery request of similar-crimes evidence based on belief another person committed crime).

In its ruling on the Defendants' Motion for Summary Judgment, the Court concluded that Plaintiff must demonstrate that the officers acted with reckless disregard (or deliberate indifference) in failing to turn over Brady evidence to the prosecution. Accordingly, the jury will be tasked with determining whether the subsequent incidents

1    at Burger King and Golden Bird were in fact "Brady" evidence and whether the officers

2    were deliberately indifferent in failing to turn over the evidence.

3        Any conclusory testimony by Plaintiff's witnesses (Roger Clark and/or the

4    prosecutors, and even the public defenders) will invade the province of the jury, confuse

5    the issues and mislead the jury. As a result thereof, the jury will simply return a verdict

6    in Plaintiff's favor, without considering the only relevant evidence, i.e. the officers

7    though processes based on the education, training, and experience. In other words,

8    Defendants will be unfairly prejudiced.

9

10                                    **III.**

11   **MR. CLARK'S TESTIMONY SHOULD BE PRECLUDED FROM TESTIFYING**

12   **THAT DETECTIVE MOODY WAS RESPONSIBLE FOR FOLLOWING OTHER**

13                              **INVESTIGATIONS**

14

15       At the time of the incident, Detective Moody was assigned as a detective to

16   LAPD's Southwest Division. LAPD had approximately nineteen (19) divisions at the

17   time of the subject investigation. It is undisputed that Plaintiff was arrested in

18   connection with robberies committed within the Crenshaw Corridor of the LAPD's

19   Southwest Division. It is also undisputed that Detective Moody was assigned the

20   demand note robberies which were subsequently attributed to Plaintiff following his

21   arrest on August 16, 2005. There is no evidence to suggest or otherwise demonstrate

22   Detective Moody was responsible for becoming aware of or following robbery

23   investigation at other Southwest Division or LAPD Divisions, either pursuant to existing

24   case law or LAPD policy.

25       At his deposition, Mr. Clark made the bold and exaggerated claim that Detective

26   Moody should have followed other investigations of demand note style robberies.

27   However, Mr. Clark was unable to identify any authority to support this ridiculous and

28                                      3

1  inflammatory conclusion.  No such testimony should be allowed because the jury will be

2  misled as to the true issues in this case.  The issue is what Detective Moody did know,

3  not what Mr. Clark thinks he should have known.

4       The proffered opinion will be offered simply to confuse the jury on the applicable

5  law and attempt to create a picture that Detective Moody should have been aware of the

6  5-second bandit robberies which were committed in other LAPD divisions.

7       Any such testimony should be precluded Federal Rule of Evidence 403 which

8  states: "Although relevant, evidence may be excluded if its probative value is

9  substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

10  misleading the jury, or by considerations of undue delay, waste of time, or needless

11  presentation of cumulative evidence."

12

13  **IV.**

14  **TESTIMONY OF THE PROSECUTORS AND DEFENSE ATTORNEYS**

15  **SHOULD ALSO BE LIMITED**

16

17       The jury is required to determine if the Defendant Officers possessed Brady

18  evidence and if they were "deliberately indifferent" in failing to turn it over to the

19  prosecution.  Pursuant to Rule 402, the opinions of the Plaintiff's expert, prosecutors and

20  defense attorneys are irrelevant to the jury's determination.  If such evidence is allowed,

21  the jury is likely to disregard the testimony of the Defendants and become confused.  As

22  such, the evidence should be precluded.  (See Declaration of Surekha A. Pessis.)

23  ///

24  ///

25  ///

26  ///

27  ///

28                                                       4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.

## CONCLUSION

For the reasons stated herein, the Motion in Limine of the Defendants City of Los Angeles, et al. should be granted.

Dated: January 28, 2010   Respectfully submitted,

> **CARMEN A. TRUTANICH**, City Attorney
> **MICHAEL L. CLAESSENS**, Senior Assistant
> City Attorney
> **CORY M. BRENTE**, Assistant City Attorney
>
> By _____
>     **SUREKHA A. PESSIS,** Deputy City Attorney
> *Attorneys for Defendants*, **CITY OF LOS ANGELES,
> LOS ANGELES POLICE DEPARTMENT,
> WILLIAM BRATTON, STEVE MOODY, and
> ROBERT PULIDO**

### DECLARATION OF SUREKHA A. PESSIS

### RE:

### DEFENDANTS' MOTIONS IN LIMINE

I, SUREKHA A. PESSIS, declare and state as follows:

1.      I am an attorney at law duly admitted to practice before all courts of the State of California and before this Court. I am a Deputy City Attorney at the Office of the City Attorney for the City of Los Angeles, Attorneys of Record for the Defendants in the matter of *Michael Walker v. City of Los Angeles, et al.*, U.S.D.C. Case No. CV 08-04707 PJW.   Except upon those matters stated upon information and belief, I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could and would testify competently thereto.

2.   Plaintiff's counsel, John Burton, deposed Deputy District Attorney, Ann Huntsman, on September 16, 2009. Ms. Huntsman's testimony provides that she does not recall the prosecution of Mr. Walker. (24:10-12.)  Further, Ms. Huntsman testified that it appears as though she authorized the filing of the Second Amended Complaint in criminal case no. BA296905, People of the State of California v. Michael Walker.  (15:2-8.)

3. Ms. Huntsman also testified that she did not recall whether information was given to her that the series of robberies involving the same "MO and the same physical description ended with the arrest of this defendant." (24:1-25.) Also, Huntsman testified she may have, but did not recall working on any case that involved a serial robbery involving a demand note as the MO. (27:3.) Further, the witness testified that she has seen reports which reference a MO of demand note. (27:4-13.)   According to Ms. Huntsman, she would not describe the MO of a note including the language, "give me your money or I'll kill you" as common, but also would not state it was a "one-time

1  thing." (27:14-21.) Attached hereto and marked as Exhibit "**A**" are true and correct

2  copies of these excerpts from the Huntsman Transcript.

3      4. I took Mr. Clark's deposition on September 29, 2009, at which time he testified

4  that Detective Moody should have been aware of the arrest of Stanley Smith, which was

5  made by the Los Angeles County Sheriff's Department. However, Mr. Clark was unable

6  to identify any LAPD policy which supported his opinion. (75:4 to 76:14) Further, Mr.

7  Clark was unable to identify any specific policy to support his opinion that Detective

8  Moody was responsible for inquiring of other detectives at other divisions as to what

9  they were working on at a given time. (76:15 to 77:17.) Attached hereto and marked as

10 Exhibit "**B**" are true and correct copies of these pages from the Clark Transcript. Thus

11 far, I do not recall receiving notification from Plaintiff's counsel that Mr. Clark has made

12 any changes to his testimony.

13     5. Mr. Clark's Rule 26(a)(2) report provides his opinions that the subsequent

14 incidents at both Burger King and Golden Bird were Brady material and should have

15 been disclosed. Any such conclusion goes to the state of mind of the Defendant Officers

16 and invades the province of the jury. If this testimony is allowed, the Defendants will be

17 unfairly prejudiced. Attached hereto and marked as Exhibit "**C**" is a true and correct

18 copy of the report.

19     6. Deputy District Attorney Ana Maria Lopez' testimony provides that she

20 handled the second preliminary hearing in Mr. Walker's case. (10:21-22.) Ms. Lopez

21 did not recall a report from Detective Moody which provided that the series of robberies

22 which involved the same MO ended with the arrest of Mr. Walker. (20:11 to 21:2.) As

23 for turning over information to the defense, Ms. Lopez' testimony provides that she turns

24 over information whether or not its inculpatory or exculpatory. This includes

25 information she described as an "item of interest" and not particularly inculpatory or

26 exculpatory. (29:6-20.) Ms. Lopez learned of the case being dismissed from Deputy

27 Public Defender, Ms. Rudman, who apparently mentioned that someone had confessed.

28

1   (33:18 to 34:22.)  Attached hereto and marked as Exhibit "**D**" are true and correct

2   excerpts from the Lopez Transcript.

3       7.  Deputy District Attorney Amy Ashvanian was also deposed on September 16,

4   2009.  Ms. Ashvanian was assigned the case during the Summer of 2007.  (9:1-9.)  Ms.

5   Ashvanian's role in the case also included turning over police reports pursuant to the

6   Court's order.  (11:4 to 14:9.)  She was also involved in the case during which time the

7   fingerprint analysis was conducted by the LAPD and then her office determined it was

8   unable to proceed.  (18:10 to 19:21.)  Ms. Ashvanian did not appear to have provided

9   any opinion at her deposition regarding whether the other police reports were Brady

10  material.  Attached hereto and marked as Exhibit "**E**" are true and correct copies of these

11  excerpts from the Ashvanian Transcript.

12

13      I declare, under penalty of perjury, pursuant to the laws of the United States of

14  America, and the State of California that the foregoing is true and correct.

15

16  Executed this ____ day of January 2010, at Los Angeles, California.

17

18  _____

19          SUREKHA A. PESSIS, Declarant

20

21

22

23

24

25

26

27

28

8

CERTIFIED COPY

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   MICHAEL WALKER,                    )
                                       )
5                   Plaintiff,         )
                                       )
6            vs                        ) NO. CV08-4707 R
                                       )
7   CITY OF LOS ANGELES, et al.,       )
                                       )
8                   Defendants.        )
    _____)

9

10

11

12

13

14

                       DEPOSITION OF
15
                       ANN HUNTSMAN
16
                   PASADENA, CALIFORNIA
17
                   SEPTEMBER 16, 2009
18

19

20

21
    RON FERNICOLA & ASSOCIATES
22  CERTIFIED SHORTHAND REPORTERS
    REPORTED BY:   RONALD A. FERNICOLA, CSR 3852
23  27720 Avenue Scott, Suite 140
    Valencia, California 91355
24  (661) 775-8299

25  FILE NO. 09760

                                                    1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   MICHAEL WALKER,                    )
                                       )
5                  Plaintiff,          )
                                       )
6          vs                          )  NO. CV08-4707 R
                                       )
7   CITY OF LOS ANGELES, et al.,       )
                                       )
8                  Defendants.         )
    _____)

9

10

11

12

13                              /

14

15          Deposition of ANN HUNTSMAN, taken on

16          behalf of the Plaintiff, at 414 South

17          Marengo Avenue, Pasadena, California,

18          commencing at 11:40 a.m., on Wednesday,

19          September 16, 2009, before Ronald A.

20          Fernicola, CSR 3852, pursuant to Notice

21

22

23

24

25
                                                      2

1        MR. BAEZA:  No foundation.

2        THE WITNESS:  I don't know.  Because this

3    complaint that is entitled "Felony Complaint for Arrest

4    Warrant" that I authorized, executed on January 26th,

5    2006 and signed by Greg Somes involves different victims

6    from the other one that you originally gave me to look

7    at, which was authorized and signed by Greg Somes,

8    entitled "Felony Complaint".

9    MR. BURTON:

10        Q.   Right.  It's actually got the same victim plus

11    also additional victims.

12        A.   I don't see that.

13        MS. PESSIS:  Can we go off the record for a

14    moment?

15        MR. BURTON:  Let's go off the record.

16             (There was a recess taken.)

17        MR. BURTON:  While we were off the record,

18    counsel were very patient with me, and we got these

19    pleadings organized.  And I think I have the five

20    pleadings in the case.  And rather than go with the

21    numbering that -- the lettering that we used before to

22    put them sequentially.  The original felony complaint in

23    case 288749 which has one count, I'm going to mark now

24    as Exhibit A to this deposition.

25             (Plaintiff's Exhibit A was

                                                        15

1     Q.    And you have no recollection of -- therefore,

2   of whether or not there was information given to you

3   that the series of robberies involving the same MO and

4   the same physical description ended with the arrest of

5   this defendant?

6           MR. BAEZA:  Vague and ambiguous, assumes facts

7   not in evidence.

8           MS. PESSIS:  I think it also lacks foundation.

9   And I'll join in Mr. Baeza's objection.

10          THE WITNESS:  Can you rephrase it, please?

11          MR. BURTON:  Can you reread it.  I'll rephrase

12  it.  I just want to hear the way I said it.

13              (The record was read as follows:

14              "Q.  And you have no

15              recollection of -- therefore, of

16              whether or not there was information

17              given to you that the series of

18              robberies involving the same MO and

19              the same physical description ended

20              with the arrest of this defendant?")

21  BY MR. BURTON:

22    Q.    Do you understand the question, or do you want

23  me rephrase it?

24    A.    I have no recollection.

25    Q.    And, therefore, you have -- and I'm assuming

                                                    24

RON FERNICOLA & ASSOCIATES

EXHIBIT  A  PAGE  12

1    robbery -- serial robbery, serial 211s, involving demand

2    notes as the MO?

3         A.    I may have.  But I don't remember.

4         Q.    Do you have a specific recollection the whole

5    time you did filings of ever working on -- on -- or

6    preparing a case which involved a series of robberies

7    with a demand note MO?

8         A.    What do you mean by "demand note"?  Like "Give

9    me your money"?

10        Q.    Right.  Where the robber has an MO of writing

11   on a piece of paper, "Give me your money or I'll kill

12   you", or something and handing it to the victim?

13        A.    I have seen reports with that MO.

14        Q.    Would you say, again, that was frequent or

15   that was rare or would it be impossible for you to

16   quantify that?

17             MS. PESSIS:  I'm going to object as it's

18   irrelevant, vague and ambiguous and it lacks foundation.

19             MR. BAEZA:  It is vague.

20             THE WITNESS:  I wouldn't say it was common.

21   But it wasn't a one-time thing, either.

22   BY MR. BURTON:

23        Q.    Would you be able to say in those cases that

24   did involve the demand note MO, whether the targets

25   tended to be banks and other kinds of financial

                                                          27

EXHIBIT __4__ PAGE ___   i 3     RON FERNICOLA & ASSOCIATES

```
 1   STATE OF CALIFORNIA      )
                              )        ss:
 2   COUNTY OF LOS ANGELES____)

 3

 4

 5

 6

 7        I, RONALD A. FERNICOLA, CSR No. 3852, certify:

 8        That the foregoing deposition of ANN ATSUKO

 9   HUNTSMAN, was taken before me at the time and place

10   therein set forth, at which time the witness was placed

11   under oath by me;

12        That the testimony of the witness and all

13   objections made at the time of the examination were

14   recorded stenographically by me and were thereafter

15   transcribed;

16        That the foregoing deposition is a true record

17   as reported by me of the testimony and all objections

18   made at the time of the examination;

19        IN WITNESS WHEREOF, I have subscribed my name

20   this 28th day of September, 2009.

21

22

23

24
                        RON FERNICOLA, CSR 3852
25
                                                        33
```

**CERTIFIED COPY**

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

MICHAEL WALKER,                              )
                                             )
                PLAINTIFF,                  )
                                             )
        V.                            )    NO.  CV 08-04707 R(FFMC)
                                             )
CITY OF LOS ANGELES, ET AL.,                 )
                                             )
            DEFENDANTS.                 )
                                             )

# DEPOSITION OF ROGER A. CLARK

## SEPTEMBER 29, 2009



COURT REPORTERS

**REPORTED BY:**
MICHELLE HUTTON
CSR. NO.  7322
JOB NO. 09AE745-MH

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT  B  PAGE  15

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MICHAEL WALKER,                        )
                                       )
                    Plaintiff,         )
                                       ) Case No.
        vs.                            ) CV 08-04707 R(FFMc)
                                       )
CITY OF LOS ANGELES, et al.,           )
                                       )
                    Defendants.        )
_____)


        Deposition of Roger A. Clark, taken
on behalf of the Defendants at 200 North
Main Street, 6th Floor, City Hall East,
Los Angeles, California, commencing at
10:26 a.m., Tuesday, September 29, 2009,
before Michelle Hutton, California
C.S.R. No. 7322.

2

1    we know they were wrong.

2        A.   Sure.   There would be probable cause to arrest

3    Mr. Walker, certainly.

4        Q.   At what point in time, if any, based on your

5    opinion did you believe or do you believe that Detective

6    Moody knew or should have known that Mr. Walker was not

7    the right guy?

8        A.   For sure?  Well, I mean, there are aspects of

9    the interview, et cetera, but bulletproof would be the

10   arrest of Mr. Smith by Lennox station.

11       Q.   When did that occur?

12       A.   9/14/05.

13       Q.   That arrest was made by deputies at the Lennox

14   station; correct?

15       A.   Correct, yes.

16       Q.   And is it your opinion that Detective Moody

17   should have been made aware of that arrest?  I'm not

18   really sure I'm following you.

19       A.   Yes.  Well, he should have been made aware -- I

20   would have expected him to be made aware, but you can see

21   the nexus between him not diligently looking at the --

22   I'll use that term, it's mine, the Golden Bird case which

23   he knows cannot possibly be Walker and then not -- and

24   not turning that over to the Robbery-Homicide that this

25   kicks off a series of events, but I fault -- you're

                                                              75

1   asking me do I fault Moody for not knowing about the

2   Lennox arrest.  I do.  That's my opinion.

3       Q.   How was he supposed to know about that?  It was

4   made by an outside agency, sir.

5       A.   Because we do that.  I mean, everybody -- and I

6   gave you an example of a Covina robbery arrest and how we

7   at San Dimas would know about it, et cetera.  We know

8   these things.  And I went to great lengths to tell you

9   how this communication system works, but I don't think

10  that excuses Moody, but I'll wait for the next question.

11      Q.   Which LAPD policies in existence during 2005

12  required Detective Moody to follow arrests made by the

13  Lennox sheriff's station?

14      A.   I'm not aware of any specific policy.

15      Q.   Was there any policy in place by the LAPD during

16  the summer of 2005 that Detective Moody was responsible

17  for inquiring of other detectives at other divisions as

18  to what they were working on at a given time?

19      A.   Well, there's a series of sections in the manual

20  for all agencies, including LAPD, and I've read them

21  where officers are to discharge their duties with due

22  diligence, and I think that falls under what we call

23  general conduct.

24           There's expectations for detectives, and

25  certainly being aware of what's going on around you is

76

18

EXHIBIT B   PAGE

1    one of them.  I'll leave it at that.  But that's the only

2    manual section I can think of that might apply here.

3        Q.   Can you identify that manual by volume and

4    section number?

5        A.   No, but you can leave a space, you know,

6    Conduct, General Conduct, Discharge of Duties, something

7    like that in the manual.

8        Q.   Is that the LAPD's manual?

9        A.   Yes, yeah.  LAPD has it, and we have it, too, in

10   the Sheriff's Department.

11       Q.   From which year are you referring?

12       A.   I think it would go back to all years.

13            MR. BURTON:  Chief Parker, huh?

14            MS. PESSIS:  Not that far.

15            THE WITNESS:  My command college thesis relied

16   heavily on Parker's book, Parker on police, and he

17   certainly says it.

18   BY MS. PESSIS:

19       Q.   Is it your opinion that Moody made an innocent

20   mistake in concluding that he had the right guy after

21   Mr. Walker was arrested at the E.B. Games?

22            MR. BURTON:  Can you just be a little more

23   precise about the time frame because that makes a big

24   difference.

25            THE WITNESS:  Well --

77

EXHIBIT ___ PAGE ___

```
 1    STATE OF CALIFORNIA      )
                               )  SS.
 2    COUNTY OF RIVERSIDE      )

 3

 4             I, MICHELLE HUTTON, CERTIFIED SHORTHAND

 5    REPORTER, CERTIFICATE NUMBER 7322, FOR THE STATE OF

 6    CALIFORNIA, HEREBY CERTIFY:

 7             THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME

 8    AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME

 9    THE DEPONENT WAS PLACED UNDER OATH BY ME;

10             THE TESTIMONY OF THE DEPONENT AND ALL

11    OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE

12    RECORDED STENOGRAPHICALLY BY ME AND WERE THEREAFTER

13    TRANSCRIBED;

14             THE FOREGOING TRANSCRIPT IS A TRUE AND CORRECT

15    TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

16             I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR

17    NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN ANY WAY

18    INTERESTED IN THE OUTCOME THEREOF.

19             IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED

20    MY NAME THIS 14th DAY OF  October , 2009.

21

22

23

24                            _____
                              MICHELLE HUTTON, CSR
25                            CERTIFICATE NO. 7322
```

W
O
R
D

I
N
D
E
X

A&E COURT REPORTERS   (213) 955-0070   FAX: (213) 955-0077

EXHIBIT _B_ PAGE _20_

# Roger Clark

### Police Procedures Consultant, Inc.
10207 Molino Rou d. Santee, CA 92071
Phone: (208) 351- 2458, Fax: (619) 258- 0045
rclark.9314@a olc om

May 20, 2009

Maria Cavalluzzi, Esq.
CAVALLUZZI & CAVALLUZZI
9200 Sunset Blvd., Suite 807
Los Angeles, California 90069

John Burton, Esq.
THE LAW OFFICES OF JOHN BURTON
414 South Marengo Avenue
Pasadena, California 91101

Regarding:    *Walker v. City of Los Angeles* – C.D. Cal. Case No. CV-08 04707 R

Dear Ms. Cavalluzzi and Mr. Burton:

Thank you for retaining me to analyze and render opinions regarding the investigation following the August 16, 2005 arrest of Michael Walker, and his subsequent 27-month incarceration and prosecution for multiple robberies. As you requested, I have restricted my review to the conduct of Los Angeles Police Department detective Steven Moody and his direct supervisor, Robert Pulido. I have also examined the impact of LAPD policies, practices and customs, especially the Department's obvious indifference to providing *Brady* material for suspects being prosecuted for serial crimes.

The materials I have reviewed (as listed below), along with our conversations about this case, appear complete enough for my expert opinions regarding the violations of standards for police practices committed by Detectives Moody and Pulido, and the effect of LADD policies practices and customs on these events.

I also reserve the right to supplement or refine my opinions based on any further information I receive regarding this unfortunate matter. In particular, I do not have the deposition testimony of Det. Moody, as his deposition is set for June 12 in Las Vegas.

My opinions and the reasons for them are set forth below.

EXHIBIT _C_ PAGE _21_

**Opinions:**

1.      Det. Moody and Det. Pulido failed to conduct themselves according to generally accepted standards of police practices when they failed to promptly notify the District Attorney's Office or Mr. Walker's criminal defense counsel of the similar August 19, 2005 Golden Bird attempted robbery and the serial robberies for which Mr. Walker was arrested three days before.

2.      Det. Pulido, and perhaps Det. Moody, failed to act according to generally accepted standards of police practices when there was no prompt notification given the District Attorney's Office or Mr. Walker's criminal defense counsel of the similar August 19, 2005 Burger King robbery and the serial robberies for which Mr. Walker was arrested three days before.

3.      Det. Moody and Det. Pulido failed to conduct themselves according to generally accepted standards of police practices when they failed to share the details of the cases underlying the charges against Mr. Walker with the investigators from Robbery-Homicide Division (RHD), whom they knew to be investigating an identical series of demand note robberies which continued after the arrest of Mr. Walker.

4.      Det. Moody and Det. Pulido failed to conduct themselves according to generally accepted standards of police practices when they failed to promptly notify the District Attorney's Office or Mr. Walker's criminal defense counsel of the investigation by RHD, whom they knew to be investigating an identical series of demand note robberies which continued after the arrest of Mr. Walker.

5.      Det. Moody failed to conduct himself according to generally accepted standards of police practices when he drafted false reports claiming that the crime spree of the demand note robber stopped with the arrest of Michael Walker. Det. Pulido failed to conduct himself according to generally accepted standards of police practices when he approved that report.

6.      The LAPD exhibited deliberate indifference to *Brady* violations by its detectives in that it fails to have a central clearing house mechanism for serial crime sprees, which are likely to cross over division boundaries, and that indifference contributed directly to the failure of Mr. Walker's defense attorneys to receive the evidence of the continuing demand note robber crime spree after the arrest of Mr. Walker, resulting in his twenty-seven month wrongful incarceration for robberies he did not commit. The management was deliberately indifferent to the *Brady* violations here, and the finding of factual innocence of someone the LAPD caused to be incarcerated for 27 months.

**Items Reviewed:**

1.      Plaintiff's Complaint for Damages

2.      Defendants' Rule 26 Disclosures including Det. Moody's and RHD's robbery books.

Page 2 of 11

EXHIBIT  C   22

PAGE

3.     Deposition of Robert Pulido

4.     Transcript of Court proceedings, *People v. Walker*

5.     Discussions with Plaintiff's Counsel, John Burton and Maria Cavalluzzi

6.     POST Learning Domains

       #1 – Leadership, Professionalism

       #5 – Introduction to Criminal Law

       #7 – Crimes Against Persons/Death Investigations

       #15 – Laws of Arrest

       #16 – Search and Seizure

       #17 – Preservation of Evidence

       #18 – Investigative Report Writing

       #30 – Preliminary Investigation

7.     *Criminal Investigation*, The International Association of Chiefs of Police, Kendall/Hunt Publishing Company, 2460 Kerper Boulevard, P.O. Box 539, Dubuque, Iowa, 52004.

**My Qualifications for Reviewing this Case:**

My opinions are based in part on my training, professional experience and education. I am a twenty-seven year veteran of the Los Angeles County Sheriffs Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, which included a detective assignment, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of POST Command College.

During the course of my service with the department, I had a wide range of duties. Those duties included an 18-month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, station detective, field supervisor, jail watch commander and administrator, station watch commander and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

Page 3 of 11

EXHIBIT ___C___ PAGE ___23___

As a Station Detective, I reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow-up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriffs Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings (OIS). I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (NORSAT), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993. Criminals investigated and arrested by NORSAT included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

EXHIBIT ___C___ PAGE ___24___

This supervisory assignment was similar in some respects to Det. Pulido's assignment as a supervisor of detectives in the Southwest Division.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy-busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to NORSAT were active homicide investigations. Our conviction rate was 97 percent, measured from time of arrest (rather than the more typical time of filing criminal charges), an unmatched record made possible by our use of sound and diligent but ethical investigative techniques. My detective experience has qualified me in every case in which I have been designated as an expert in police investigations and police administration of police investigations. For example, in 2006, Judge Feess qualified me to testify regarding detective practices in *Ramirez v. County of Los Angeles*. That case resulted in a verdict of $18 million.

During the first three months of my command of NORSAT, the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, NORSAT established a remarkable record of more than two thousand arrests of career criminals without a single shot fired -- either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.

This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct investigation and apprehension methods and adherence to the moral and ethical standards endorsed by California POST and law enforcement generally. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of NORSAT, I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remains in force today, without change, and includes the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert in both civil and criminal cases on police administration, police procedures, police tactics, police investigative procedures, basic evidence evaluation and shooting scene reconstruction, and jail procedures and jail administration. I have qualified in Arizona State Courts, California Courts, Washington State Courts and Federal

Page 5 of 11

EXHIBIT C PAGE 25

Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington. I have
also submitted written opinions in matters before Alaska, Idaho, Montana, North Carolina,
Oregon and Wyoming Federal and State Courts.

I I have testified before the Los Angles Police Department Board of Rights and the Los Angeles
County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury.
I was selected (January 20, 2007) to present on the Topic of "Police Experts" at the National
Police Accountability Project held at Loyola Law School, Los Angeles, California. I have
worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project, the
Texas Civil Rights Project (Austin, Texas) and Innocence Project (Chicago, Illinois). I have
been recognized, and my expert report was quoted by the United States Court of Appeals for the
Ninth Circuit as an expert in Police Administration and Use of Force (For Publication – Gary
Blankenhorn v. City of Orange, et al. No. 04-55938, D.C. No. CV-02-01160-GLT Opinion). The
Ninth Circuit also drew from my expert report in a second published case involving Police
Detective Investigations (For Publication – Raymond Torres, et al v. City of Los Angeles, et al,
No. 06-55817, D.C. No. CV-05-04171-RGK Opinion).

On February 10, 1989, I was personally commended at the Los Angeles County Hall of
Administration by United States Attorney, the Honorable General Edwin Meese III, for my work
to establish California Penal Code Section 311.11 (forbidding the Possession of Child
Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a
second personal commendation for the success of this critical 5 year effort to bring this law into
effect.

I have been found competent by both Federal and State Courts to render opinions as to the duties
and responsibilities of police officers regarding their individual and collective responsibilities as
occurred in this case. A number of my cases have involved law enforcement officers as civil
plaintiffs and as criminal defendants. My CV, fee schedule and a complete listing of my expert
testimony on all matters since January 2005 are enclosed with this report.

**Reasons for My Opinions:**

    (a)   Introduction

In summary, the defendant detectives violated their professional obligation to provide clearly
exculpatory information regarding the continuation of the demand note robberies by a man
matching the general description of Michael Walker after Mr. Walker's August 16, 2005 arrest.
This professional obligation is trained in academies and reinforced throughout police agencies. It
is based on the direction of the Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963). This is
a decision, like *Miranda*, which is taught to officers and understood to apply, particularly to
detectives who investigate crimes.

The fundamental principle here is that police officers and detectives are not in the role of
advocates, free to bend the facts and suppress evidence in order to influence the outcome in

Page 6 of 11

EXHIBIT___C___ PAGE ___26___

court. Instead they are tasked with assembling all the relevant evidence, inculpatory and exculpatory, in a neutral manner, and then providing it to the criminal justice system, which then is responsible for determining the truth through the operation of the adversary system. This entire process breaks down, and justice is denied, when a detective suppresses clearly exculpatory information, or files a false report to make the factual record seem different than it actually is.

    (b)    **The Demand Note Robberies and Arrest of Michael Walker**

Beginning in the early summer of 2005, a series of robberies of small commercial establishments occurred in the Los Angeles area in which the perpetrator was a thin, middle-aged African-American male on foot, who simulated a weapon and used a demand note. While demand note robberies are common for banks and other financial institutions, they are relatively uncommon for fast-food restaurants, video rental stores, and the other cash businesses being robbed during this spree.

Two notable facts about these robberies were the consistency of the *modus operandi* (MO) and the description of the suspect. Several were caught on surveillance video. Although I have not yet been provided copies of those videos to view, the descriptions and the poor quality stills I've seen indicate a single serial robber, most likely a drug addict, perpetrated all of them.

On August 13, one such robbery occurred at EB Games, a business located at 3701 South La Brea Avenue. The perpetrator, a thin, middle-aged African-American man, entered the store as if he were a customer, placed a video game on the counter, handed the clerk a note reading: "This is a robbery, give me all the money in the register," and moved his hand toward his waistband as if reaching for a gun. He obtained money and fled on foot. A fingerprint subsequently lifted from the video game was preserved as evidence.

On August 16, Michael Walker innocently walked into the same store as a customer. He had been in the store in the past, which is a common cause of eyewitness misidentification. Witnesses to the August 13 robbery mistakenly thought Mr. Walker was the perpetrator. Police were called and plaintiff arrested. After his arrest, Mr. Walker was interviewed by defendant Detective Steven Moody, who was assigned to Southwest Division. Mr. Walker waived his right to remain silent and denied involvement.

On August 17, 2005, Detective Moody wrote a report stating: "The suspect's M.O. is to enter the business posing as a customer, present a demand note to the cashier, take cash and leave on foot. The suspect has on occasion simulated and/or displayed a handgun." Detective Moody incorrectly, but perhaps not without justification (I haven't seen the video he references, and there is the issue regarding the corn-rolls versus the shaved head) concluded that Mr. Walker was the "Demand Note Robber" seen "committing numerous robberies on videotape and still photographs." As a result of the mistakes by the EB Games clerks and by Det. Moody, which appear to me in all likelihood to be innocent, a complaint alleging one count of robbery was filed against Mr. Walker on August 18.

EXHIBIT _C_ PAGE _27_

    (c)    **The Continuation of the Demand Note Robberies and Arrest of Stanley Smith.**

The next day, August 19, 2005, an attempted robbery and a robbery involving a thin, middle-aged African-American male with the same MO – on foot, a demand note, a simulated weapon – occurred at The Golden Bird, a chicken restaurant, and at a Burger King, both located in Southwest Division. Responding LAPD officers obtained the security videotapes. Detective Moody was the investigating officer for The Golden Bird and conducted the follow-up investigation, which included watching the videotape. Detective Moody saw that the suspect on the videotape, rather than plaintiff, was in fact the "Demand Note Robber." Detective Moody failed to act pursuant to POST standards of conduct when he failed to re-evaluate the case against Mr. Walker in light of this rather powerful exculpatory evidence. There is no evidence in the file that he turned the evidence over to the District Attorney and to Mr. Walker's defense counsel. Instead, he subsequently authored at least two false reports which stated that the demand note robberies stopped with Mr. Walker's arrest. This violated *Brady*, as understood by police officers and detectives.

During August 2005, RHD detectives assumed investigative responsibility for a connected series of robberies occurring in Los Angeles. The suspect was a thin, middle-aged African-American male who targeted small businesses posing as a customer on foot. His MO was to present a demand note. The suspect was dubbed "The 5-Second Bandit." The subject was obviously the same person as Det. Moody's "Demand Note Robber." The robberies were continuing after Mr. Walker's arrest on August 16.

Bulletins were disseminated and posted at various LAPD locations, including Southwest Division, requesting reports involving similar robberies. This investigation was known to Det. Pulido and Det. Moody. Detective Pulido knew the status of Detective Moody's "Demand Note Robber" investigation and deliberately withheld the information from RHD. Detective Moody, as well, deliberately withheld the "Demand Note Robber" reports from RHD and deliberately avoided mentioning the arrest of Mr. Walker to RHD detectives.

On September 8, 2005, Det. Moody authored a follow up report listing Mr. Walker as the perpetrator of 13 robberies and attempted robberies, all with the familiar MO of being on foot, a demand note, and simulated firearm. The report makes no mention of the similar "Golden Bird" attempted robbery of August 19, or the similar robberies being investigated by RHD. Instead, the report states "there is no doubt that Walker committed all the listed crimes," mentioning the similarity in appearance and the consistent MO. The report misleadingly states that of three witnesses who said the perpetrator had hair, "Walker admitted to having recently shaved his head." In fact, Mr. Walker was referring to his regular grooming. He told Det. Moody that he had worn his head shaved for years, which was in fact the case.

On September 14, 2005, Stanley Smith was arrested by the Los Angeles Sheriff Department for a demand note robbery of a Blockbuster video rental store in Lawndale. Mr. Smith was a thin, middle-aged African-American male then addicted to crack cocaine. RHD detectives interviewed

Mr. Smith, who admitted to perpetrating at least two robberies a week in the Los Angeles area to support his cocaine habit, using a demand note and simulating a firearm. RHD was able to clear all sit demand note robberies with Mr. Smith's arrest. Obviously, he was the perpetrator of the robberies for which Mr. Walker was being charged. The RHD detectives could not clear Mr. Walker of those robberies, however, because Det. Moody and Det. Pulido withheld those reports from RHD, despite knowing of the investigation.

        **(d)   Det. Moody and Det. Pulido Continue to Investigate Mr. Walker Despite Knowing Him Not To Be the Demand Note Bandit**

On September 27, 2005, the prints on the EB Games boxes handled by the perpetrator came back as not Mr. Walker's. Nevertheless, Detective Moody pressed forward to convict him of crimes Detective Moody knew he did not commit. Disregarding the overwhelming exculpatory evidence then known to him, Detective Moody prepared photographic and live lineups to be viewed by witnesses to various robberies. The resulting identifications were largely equivocal and not accurately reported by Det. Moody.

Detective Moody prepared follow up investigation reports dated September 28 and November 11, 2005, approved by Det. Pulido, listing twelve robberies, in addition to the EB Games robbery, Mr. Walker supposedly committed as the "Demand Note Robber." Both reports falsely claim that the crime spree ended with Mr. Walker's August 16 arrest. The report contains numerous misstatements and omits material exculpatory information and evidence, including, most importantly, the fact that demand note robberies continued for a month after Mr. Walker's arrest.

On January 26, February 2, and June 27, 2006, new complaints were filed by the District Attorney's office against Mr. Walker, resulting in his ultimately being charged with eight counts of robbery, including the one at EB Games, the cause of his arrest. After a preliminary hearing on September 7 and 11, 2006, Mr. Walker was held to answer to five counts of robbery, all except the EB Games crime based solely on the eyewitness identifications made first from Detective Moody's photo lineup. Mr. Walker's criminal defense counsel did not have access to the exculpatory evidence of the continued demand note robberies because Det. Moody and Det. Pulido did not turn it over. Instead, defense counsel, and the District Attorneys Office for that matter, appear to have been mislead by Det. Moody's reports stating that the demand note robberies ceased with Mr. Walker's August 16, 2005 arrest.

        **(e)   Det. Moody and his Successors Ignore Discovery Requests.**

Beginning February 7, 2006 -- seven months before the preliminary hearing -- Mr. Walker's counsel made repeated discovery requests to the District Attorney's Office, including demands for all exculpatory evidence. These demands were relayed to the LAPD Southwest Division detectives under Det. Pulido's command. Nothing was turned over regarding the subsequent crimes with the same MO, nor was the RHD investigation or Mr. Smith's arrest disclosed.

Page 9 of 11

EXHIBIT ___C___ PAGE _____

In a discovery letter dated November 7, 2006, Mr. Walker's counsel explicitly requested "All police reports, from 1/05 to the present, documenting robberies in the area of Baldwin Hills Plaza and Crenshaw Business District, and surrounding areas, with the same or similar 'MO' - male black suspect enters a business posing as a customer, presents a 'demand note' to the cashier, takes cash and leaves." Still nothing was turned over.

At a March 13, 2007 discovery hearing, Mr. Walker's counsel again requested reports of robberies involving a similar MO occurring after the date of his arrest. His counsel had received no reports regarding robberies following his arrest, although the Southwest Division detectives under Det. Pulido's supervision were, at minimum, aware of the two similar crimes on August 19, 2005 – the Burger King and Golden Bird holdups – one of which had been assigned to Detective Moody for investigation. The trial court ordered "that the detective will look through the crime reports for Southwest Division starting with the date of [Mr. Walker's] arrest, 8/16/05, and also look at September, October and November '05 and pull all of those crime reports." At this time, Detective Moody had retired and a newly assigned detective was ordered to "Review all the crime reports and see whether there are any business robberies involving male black suspects where there was a demand note that was presented."

As a result, the reports of the robberies which occurred on August 19, 2005 at the Golden Bird restaurant and at Burger King were finally turned over on May 2, 2007, 21 months after they were known to Moody and Det. Pulido. Subsequently, after his counsel read the report and requested the videotape of the Golden Bird crime, LAPD representatives claimed that it was destroyed on November 9, 2006, two days after the written discovery request. The destruction of this highly exculpatory evidence was authorized by defendant Detective Richard Record. I cannot understand how evidence in an unsolved attempted armed robbery only 15 months earlier could be destroyed. Unfortunately, I do not have Det. Record's deposition.

### (f)    The Truth Finally Comes Out

During late October 2007, Southwest Division detectives finally revealed the many robberies investigated by RHD involving a similar method as those robberies being charged against Mr. Walker. Upon receiving the reports referring to Stanley Smith as the perpetrator of similar robberies, Mr. Walker's expert compared the fingerprint lifted from the EB Games box with Mr. Smith's prints, and determined that the fingerprints were a match. On November 26, 2007, an LAPD fingerprint expert reported the same conclusion. As a result, all the charges against Michael Walker were dismissed and he was released from custody, having spent more than 27 months behind bars for robberies defendants knew within the first week of his arrest that Mr. Walker did not commit. The Court subsequently entered a finding of factual innocence.

### (g)    The Role of Policies and Supervision

This incident happened because of a serious breakdown of basic responsibility by Det. Moody and by his supervisor, Det. Pulido. There seems to be a bigger problem here, which arises from the fact that serial criminals like Mr. Smith generally commit crimes in more than one LAPD

Page 10 of 11

EXHIBIT _C_ PAGE 30

division. Any time there is a representation that a serial crime spree stopped with the arrest of an individual, as in this case, evidence of each subsequent similar crime becomes *Brady* material and must be turned over to the criminal defendant's counsel.

Here, there is a deliberate indifference to such consequences. Had the LAPD had the basic policy in place of reporting serial robbery suspects to RHD, they could be matched with similar crimes throughout the City. That could prevent other miscarriages of justice as well.

Moreover, it is very disturbing that there were no consequences for Det. Pulido after his supervision was responsible for the 27-month wrongful imprisonment of a factually innocent man. I am deeply saddened by what I perceive as a dramatic deterioration of respect for professional standards in law enforcement since my retirement 15 years ago. While the LAPD's policies are basically sound, their violations are frequently ignored.

Throughout recent history there have been countries with all the trappings of free elections, democratic institutions and guarantees of individual liberties, which were in reality despotic dictatorships. Rules and policies are only valid if enforced. This case shows that flagrant violations of the rules pertaining to disclosure of *Brady* materials is tolerated by LAPD managers.

Enclosed please find a statement listing my law enforcement qualifications and experience; my fee schedule and a listing of matters in which I have testified in the last four years as an expert.

I declare under penalty of perjury that the foregoing is true and correct. Executed May 20, 2009, at Santee, California.

_____
Roger A. Clark

EXHIBIT _C_ PAGE _____    31

CERTIFIED COPY

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4   MICHAEL WALKER,                      )
                                         )
5                    Plaintiff,          )
                                         )
6              vs                        ) NO. CV08-4707 R
                                         )
7   CITY OF LOS ANGELES, et al.,         )
                                         )
8                    Defendants.         )
    _____)

9

10

11

12

13

14

                         DEPOSITION OF

15

                       ANA MARIA LOPEZ

16

                     PASADENA, CALIFORNIA

17

                     SEPTEMBER 16, 2009

18

19

20

21

22   RON FERNICOLA & ASSOCIATES
     CERTIFIED SHORTHAND REPORTERS
     REPORTED BY:   RONALD A. FERNICOLA, CSR 3852
23   27720 Avenue Scott, Suite 140
     Valencia, California 91355
24   (661) 775-8299

25   FILE NO. 09760

                                                              1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    MICHAEL WALKER,                    )
                                        )
5                    Plaintiff,         )
                                        )
6            vs                         ) NO. CV08-4707 R
                                        )
7    CITY OF LOS ANGELES, et al.,       )
                                        )
8                    Defendants.        )
     _____)

9

10

11

12

13

14

          Deposition of ANA MARIA LOPEZ, taken on
15
     behalf of the Plaintiff, at 414 South
16
     Marengo Avenue, Pasadena, California,
17
     commencing at 10:05 a.m., on Wednesday,
18
     September 16, 2009, before Ronald A.
19
     Fernicola, CSR 3852, pursuant to Notice
20

21

22

23

24

25

                                                            2

1    of, I believe it was, 2006.

2        Q.   And do you recall what stage the litigation

3    was at at that point?

4        A.   It was post-arraignment, pre-preliminary

5    hearing.

6        Q.   It's somewhat confusing in this case, you

7    know, to me -- I don't practice criminal law, although

8    my co-counsel, Miss Cavalluzzi does -- because there

9    were -- there were some prelims, and then there were

10   some dismissals and some re-filings.

11       Are you familiar with that in this case?

12       A.   There was a prelim, a dismissal because the

13   people announced "Unable to Proceed", and then a

14   re-filing before I got the case.

15       Q.   And then he had been arraigned on the

16   re-filing, and then you came in before the prelim on the

17   re-filing?

18       A.   He was arraigned on the criminal complaint.

19   And then at some point thereafter, I was assigned the

20   case.  And it/ was still pending preliminary hearing.

21       Q.   And so you handled the preliminary hearing?

22       A.   The second preliminary hearing, I handled.

23       Q.   And then he was held to answer after that?

24       A.   As to some of the charges.

25       Q.   Do you recall how many?

                                                        10

1    charged with in the complaint that went to preliminary

2    hearing that you handled, do you recall whether they

3    involved a common MO?

4         A.   I only recall the robberies for which we

5    actually produced witnesses.  I don't recall anything

6    about the other robberies.  And my recollection is that

7    there was a similarity.  I don't recall the specifics as

8    to how similar, but I remember there was a similarity

9    between each of the robberies for which we produced

10   witnesses.

11        Q.   Do you recall a report -- and I'll represent

12   to you it does exist; I'm not making this up -- by the

13   investigating officers, Det. Moody, to the effect that

14   this series of robberies that involved the same MO ended

15   with the arrest of Michael Walker?

16             MR. BAEZA:  Does she remember a report that

17   says that, or words to that effect?

18   BY MR. BURTON:

19        Q.   Do you remember that being the case; that

20   there was a series of robberies with a similar MO and

21   then that series ended with the arrest of Michael

22   Walker?

23             MR. BAEZA:  The question is vague and

24   ambiguous.

25             MS. PESSIS:  I'll join.

                                                    20

1    THE WITNESS:  I don't recall whether or not

2    that was stated in any report.

3    BY MR. BURTON:

4    Q.   Was that your understanding, that there was a

5    series of robberies involving a -- a similar MO that

6    stopped when Mr. Walker was arrested?

7    A.   I don't remember whether or not that was a

8    point of interest or something that I knew or thought

9    about at that time.  I don't remember.

10    Q.   Did -- while you were handling the case, did

11    the L.A.P.D. detectives, anybody from the L.A.P.D.,

12    provide you with a report of a robbery that happened

13    within the month following Mr. Walker's arrest that

14    involved the same geographic area of the city, general

15    geographic area, the same MO and the same general

16    suspect description?

17    MS. PESSIS:  I'm going to object that it lacks

18    foundation and calls for speculation that the subsequent

19    robbery had the same MO.

20    THE WITNESS:  What I recall is that there were

21    police reports prepared by the Los Angeles Police

22    Department in our district attorney file that,

23    presumably, came from the Los Angeles Police Department.

24    Apart from the specific robberies that I actually

25    presented at the preliminary hearing, I don't really

21

1   exculpatory to decide whether or not you're going to

2   turn it over?

3          MR. BAEZA: Argumentative; mischaracterizes

4   prior testimony.

5          MS. PESSIS: I think it's also vague.

6          THE WITNESS: When I review information, I

7   think that I form a judgment as to whether or not it's

8   inculpatory or exculpatory. But I turn it over, whether

9   or not it's inculpatory or exculpatory. I think that --

10  I'm -- I'm not -- I'm having difficulty with -- with the

11  part about I don't form a judgment. Obviously, I form

12  an opinion when I look at it, whether or not it's

13  inculpatory, exculpatory or maybe just of interest. If

14  it's requested by the defense, it doesn't matter one way

15  or the other. I turn it over if it's a request -- if I

16  request it, I turn it over. It doesn't matter whether

17  or not it's inculpatory, exculpatory or maybe just an

18  item of interest but not particularly inculpatory or

19  exculpatory. I don't -- I don't know if that answers

20  your question.

21  BY MR. BURTON:

22     Q.    But you turn it over regardless?

23     A.    I turn it over, yes.

24     Q.    And is that what you understand to be the

25  practice of your office?

29

1          Have we covered everything that you can recall

2     about discovery in the Michael Walker case that you can

3     recall as you sit here?  This is just sort of a clean-up

4     question.

5          MR. BAEZA:  The question is overbroad.

6          THE WITNESS:  That -- that is very broad.  I

7     mean -- I don't remember -- really remember everything

8     that we've covered here.  I -- I can't answer that.  I

9     mean, I don't know that there may or may not be things

10    that -- that you haven't asked me.  I just don't -- I

11    just can't say.

12         MR. BURTON:  Okay.

13    Q.    After you -- after the case was transferred

14    from you to another deputy, let's say, basically in the

15    beginning of 2007 when you became a calendar deputy, did

16    you have anything else to do with the case whatsoever?

17    A.    No.

18    Q.    Did you hear about how it got resolved, let's

19    say more or less at the time?

20    A.    When you say "more or less at the time", what

21    do you mean?

22    Q.    Well, I'm sure you know now what happened,

23    since you've been subpoenaed and you've come in and

24    everything.

25    A.    I heard in the elevator from the public

33

EXHIBIT ___ PAGE ___ 38

1  defender that the case had been dismissed. And that was

2  maybe a year or two -- about a year later I saw her in

3  the elevator.

4      Q.   And that would make sense. It was in November

5  of 2007 when the case was dismissed.

6      A.   I can't say when I saw the public defender in

7  the elevator. I don't remember.

8      Q.   Was that the same public defender who was

9  handling the case when you were handling it?

10      A.   I believe her name is Rudman.

11      Q.·   And did she tell you what had happened?

12      A.   She told me something. And I don't know that

13  my recollection on that is accurate. But she told me

14  something.

15      Q.   Well, what's your best recollection on what

16  she told you happened?

17      A.   What I remember her saying was that somebody

18  had confessed to it. And -- and that's what I remember

19  her saying. And I don't know that my memory on it is

20  accurate. But I remember her saying something to that

21  effect. Or somebody else had confessed, is what I

22  remember. How accurate that is, I couldn't say.

23      ·MS. PESSIS: I'll just assert a belated

24  objection based on hearsay.

25  ///

34

1  STATE OF CALIFORNIA       )
                             )          ss:
2  COUNTY OF LOS ANGELES____ )

3

4

5

6

7          I, RONALD A. FERNICOLA, CSR No. 3852, certify:

8          That the foregoing deposition of ANA MARIA

9  LOPEZ, was taken before me at the time and place therein

10 set forth, at which time the witness was placed under

11 oath by me;

12         That the testimony of the witness and all

13 objections made at the time of the examination were

14 recorded stenographically by me and were thereafter

15 transcribed;

16         That the foregoing deposition is a true record

17 as reported by me of the testimony and all objections

18 made at the time of the examination;

19         IN WITNESS WHEREOF, I have subscribed my name

20 this 28th day of September, 2009.

21

22

23

24                              RON FERNICOLA, CSR 3852

25

                                                        40

RON FERNICOLA & ASSOCIATES

CERTIFIED COPY

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4    MICHAEL WALKER,                    )
                                        )
5                   Plaintiff,          )
                                        )
6              Vs                       )  NO.   CV08-4707 R
                                        )
7    CITY OF LOS ANGELES, et al.,       )
                                        )
8                   Defendants.         )
     _____)

9

10

11

12

13

14

15                        DEPOSITION OF

16                        AMY ASHVANIAN

17                     PASADENA, CALIFORNIA

18                     SEPTEMBER 16, 2009

19

20

21

22   RON FERNICOLA & ASSOCIATES
     CERTIFIED SHORTHAND REPORTERS
23   REPORTED BY:  RONALD A. FERNICOLA, CS 3852
     27720 Avenue Scott, Suite 140
24   Valencia, California 91355
     (661) 775-8299

25   FILE NO. 09760

                                                          1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   MICHAEL WALKER,                    )
                                       )
5                  Plaintiff,          )
                                       )
6          vs                          )  NO. CV08-4707 R
                                       )
7   CITY OF LOS ANGELES, et al.,       )
                                       )
8                  Defendants.         )
    _____)

9

10

11

12

13

14

            Deposition of AMY ASHVANIAN, taken on

15

            behalf of the Plaintiff, at 414 South

16

            Marengo Avenue, Pasadena, California,

17

            commencing at 12:40 p.m., on Wednesday,

18

            September 16, 2009, before Ronald A.

19

            Fernicola, CSR 3852, pursuant to Notice

20

21

22

23

24

25

                                                              2

```
 1        Q.    Do you know -- So you couldn't tell us what
 2   month it was that you took over the file?
 3        A.    It had to be maybe summer of 2007, because I
 4   got --
 5        Q.    That sounds about right.
 6        A.    Well, I got transferred to downtown either
 7   April or May of 2007.  So it had to be couple months
 8   after.  Maybe July, maybe August.  I'm not sure.  I
 9   don't remember.
10        Q.    And do you remember what the status of the
11   case was when you first took it over?
12        A.    Well, the  -- when I got the case, I believe
13   it was set for a pretrial to be sent out for trial.
14   That's how we get the cases.  That's how the DAs get
15   ready for trial.
16        Q.    Do you know whether you handled any discovery
17   on this case?
18        A.    I believe so.  I believe so.  Pretrial
19   discovery, yes.
20        Q.    And can you recall what pretrial discovery you
21   personally were involved in?
22        A.    If I remember correctly, there was a discovery
23   request from the defense as to similar robberies within
24   either three or six months prior and after the date of
25   incident involved in that particular case with
```

9

1 | mistaken.

2 |     Q.   Do you know her first name?

3 |     A.   Ella, maybe.  Ella Eksler.

4 |     Q.   So is it your recollection that prior to your

5 | getting the file, that discovery requests had been made,

6 | and that the public defender was still waiting to get a

7 | full response to -- or what they considered to be a full

8 | response to those requests?

9 |     A.   I'm not sure if they were waiting to get full

10 | response.  My recollection is that they were actually

11 | asking for additional discovery about additional time

12 | frame that they wanted to get the reports from.  That

13 | was my understanding, if I'm not mistaken.  This was

14 | like two-and-a-half years ago.

15 |     Q.   Did you -- do you recall having any

16 | conversations with the detectives for the L.A.P.D. about

17 | obtaining discovery or discovery compliance?

18 |     A.   I had to -- I mean, I had to, because I

19 | remember that the Court had ordered that L.A.P.D.

20 | provide the -- either the three months or something like

21 | six-months period.  And so I had to contact and leave a

22 | message for the -- if I'm not mistaken, I had to

23 | actually find a -- what they call the acting

24 | investigating officer, because the original

25 | investigating officer was not handling the case anymore,

                                                       11

1    had moved or something.  So I actually had to leave

2    messages for them to respond so I can tell him "Hey, the

3    Judge is asking for six months of similar MO robberies

4    in the area."  Yes, I do remember.

5         Q.   Can you remember the name of the individual at

6    the L.A.P.D. that you ultimately contacted?

7         A.   I don't remember, off the top of my head.  But

8    I know it was Robbery Homicide.  And it had to be

9    detective -- a detective who was taking over the

10   original IO's case.  But I don't remember his name.

11        Q.   Are you sure it was Robbery Homicide?  Because

12   the original IO was Southwest Division.  Could it have

13   been a robbery detective from Southwest?

14        A.   Could have been.  I don't remember exactly.

15        Q.   Do you know who Det. Robert Pulido is?

16        A.   It doesn't ring a bell.

17        Q.   He's -- he's the D-III that -- that -- the

18   head of the Robbery detectives at Southwest.

19        A.   I don't remember that name.  That name doesn't

20   ring a bell.

21        Q.   So you -- you left some messages to -- to

22   locate the acting IO.

23             Did you eventually contact somebody who you

24   thought was the acting IO?

25        A.   Yes.  They actually called me, I believe, and

                                                          12

1   informed me that they were handling this case for the

2   original IO.  And that's when I requested that they

3   provide the specific discovery that was ordered by the

4   Court.  Yeah, I told a detective.

5       Q.   So you had that conversation with a detective,

6   but you just right now can't remember the detective's

7   name?

8       A.   Name, exactly.

9       Q.   And then what was the upshot of that?

10      A.   Well --

11          MR. BAEZA:  The question is vague and

12   ambiguous.

13          THE WITNESS:  They had to -- I remember them

14   bringing documents.  And it was a full binder of

15   documents that I have to make copies, two copies.  Our

16   office made two copies, one for Miss Eksler and one for

17   us.  And there were reports requested by the Court of

18   this particular time period within some geographical

19   area.

20   BY MR. BURTON:

21      Q.   So as a result of this conversation with this

22   acting IO, some time period passed.  And then he said,

23   "Here's information that is responsive to your discovery

24   request".  And you got a binder full of reports?

25      A.   I don't know how much time had passed.  I'm

                                                      13

1   not sure what the timing of it was.  But I remember the

2   detectives bringing documents that I had to copy for

3   both of us, for the PD and for myself, for our file.

4       Q.   Do you know if that -- you mentioned a binder.

5            Did it seem like there was a Robbery Book?

6       A.   It could have been.  I'm not sure.  Or maybe

7   it was their collected, accumulated reports.  I'm not

8   sure what the document was.  But I'm -- I remember, I

9   had to make two binders for us.

10      Q.   Okay.  And do you remember if it was a -- I

11  think I already know your answer, but I want to ask the

12  question, anyway.

13           You don't know whether it was an RHD Robbery

14  Book?

15      A.   I do not remember that.

16      Q.   But it was a collection of, among other

17  things, of different crime reports for 211s?

18      A.   Yes.  Yes.

19      Q.   And did you understand these 211s to be 211s

20  other than the ones that were attributed to or charged

21  against the defendant, Michael Walker?

22      A.   If I'm not mistaken, I believe there were

23  reports that actually were part of the Michael Walker

24  case as well.  But then there were some other reports as

25  well.  So I'm not sure if this was only reports not

                                                    14

1   to, but I remember she, I believe, gave me like a DR

2   number or something so I can go and look for that

3   report, because it was a voluminous discovery request.

4   And she indicated that she would want the evidence

5   booked on a particular report to be tested for

6   fingerprints by L.A.P.D.  I remember that much.

7        Q.   You can't tell us, as you sit here today, what

8   date this book was turned over to Miss Eksler?

9        A.   No, sir.  I don't remember.

10       Q.   Sometime -- we know the case was dismissed

11  right around Thanksgiving of 2007.

12            So this would have been sometime in the summer

13  or early fall?

14       A.   If -- I don't remember when it was dismissed.

15  But if your report indicates it was around Thanksgiving,

16  it had to be right before that.  Because the analysis

17  that was done by L.A.P.D. was done "Urgent", and then we

18  announced "Unable to Proceed".  So it hadn't gone like a

19  couple three months or a month.  It was very quick.  So

20  it had to be around that time.

21       Q.   And who -- so this response that you passed on

22  from the L.A.P.D. in 2007 to the attorneys for

23  Mr. Walker, Miss Eksler, that led to a sequence of

24  events which resulted in the case being dismissed?

25       A.   I turned over discovery to Miss Eksler.  She

18

EXHIBIT _6_ PAGE _48_          RON FERNICOLA & ASSOCIATES

1    provided me with a specific report that she was

2    interested in.  We had L.A.P.D. conduct a fingerprint

3    testing.  The results came back.  And we informed

4    Miss Eksler that we were going to announce "Unable to

5    Proceed".

6         Q.   On the entire case?

7         A.   That's correct.

8         Q.   And without getting too much into -- I

9    don't know, work product or privilege -- why were you

10   unable to proceed?

11        A.   I don't make the decisions.  Those decisions

12   of dismissing cases or "Unable to Proceed" come from

13   head deputy level.

14        Q.   So whatever the issues were -- and we know

15   what they are -- were presented by you and whoever else

16   to your supervisors?

17        A.   That's correct.

18        Q.   And the supervisors made a decision you're to

19   announce "Unable to Proceed in this case".  And then

20   that was done.  And then the case was dismissed?

21        A.   That's correct.

22        Q.   And so who -- who -- from your point of view,

23   who actually made that decision?

24             MR. BAEZA:  It may call for speculation.

25             THE WITNESS:  I believe it's made on, you

                                                    19

1  STATE OF CALIFORNIA          )
                                )        ss:
2  COUNTY OF LOS ANGELES____)

3

4

5

6

7          I, RONALD A. FERNICOLA, CSR No. 3852, certify:

8          That the foregoing deposition of AMY ASHVANIAN,

9  was taken before me at the time and place therein set

10  forth, at which time the witness was placed under oath

11  by me;

12          That the testimony of the witness and all

13  objections made at the time of the examination were

14  recorded stenographically by me and were thereafter

15  transcribed;

16          That the foregoing deposition is a true record

17  as reported by me of the testimony and all objections

18  made at the time of the examination;

19          IN WITNESS WHEREOF, I have subscribed my name

20  this 28th day of September, 2009.

21

22

23

24                                      _____
                                        RON FERNICOLA, CSR 3852
25

                                                          30